No. 01-268

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2002 MT 225

ROGER GRENFELL,

       Plaintiff and Respondent,

    v.

GARY ANDERSON, individually; GARY
ANDERSON, d/b/a PG&L MARKETING, INC.;
and PG&L, INC., and JOHN DOE ONE,

       Defendants and Appellants,

    and

GARY ANDERSON, individually; GARY ANDERSON,
d/b/a PG&L MARKETING, INC.;and PG&L, INC.,

       Defendants and Counterclaimants

    v.

ROGER GRENFELL,

       Plaintiff and Counterdefendant.

APPEAL FROM:    District Court of the Fourth Judicial District,
                In and for the County of Missoula,
                Honorable Douglas G. Harkin, Judge Presiding

COUNSEL OF RECORD:

       For Appellants:

            Linda Osorio St. Peter, St. Peter & Warren, Missoula, Montana

       For Respondents:

            P. Mars Scott, Missoula, Montana

                            Submitted on Briefs:  October 4, 2001
                                     Decided:  October 10, 2002

Filed:

                                Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Defendants and Appellants Gary Anderson and PG&L, Inc. (Anderson) appeal from judgment entered by the Fourth Judicial District Court, Missoula County, pursuant to remand by this Court in *Grenfell v. Anderson*, 1999 MT 272, 296 Mont. 474, 989 P.2d 818 (*Grenfell I*).    On remand the District Court entered amended findings of fact and conclusions of law awarding Anderson $25,800 in lost profits for Plaintiff and Respondent Roger Grenfell's (Grenfell) breach of the commercial lease agreement and denying Anderson's claim of breach of the implied covenant of good faith and fair dealing, and denying Anderson's claims for treble damages and punitive damages for forcible entry and forcible detainer, and for tortious interference with a contract.    Anderson appeals the denial of his claims and raises the following issues for review:

¶2    **1.  Did the District Court exceed its jurisdiction on remand?**

¶3    **2.    Did the District Court mistakenly base Anderson's counterclaim for breach of the lease agreement on an issue not pled or raised at trial?**

¶4    **3.  Did the District Court err in concluding that Anderson was not the prevailing party and therefore not entitled to attorney fees?**

¶5    **4.    Did the District Court err in denying Anderson's counterclaims for forcible entry and forcible detainer?**

¶6    **5.    Did the District Court err in denying Anderson's counterclaim for tortious interference?**

¶7    **6.    Did the District Court err in denying Anderson's counterclaim for punitive damages?**

*BACKGROUND*

¶8   We review here only the necessary and relevant factual and procedural background required to make a determination of the issues herein on appeal.   For a full background discussion, see *Grenfell I*.

¶9   This action originally arose from a commercial lease agreement entered into by Grenfell and Anderson on January 18, 1989, for property located on Brooks Avenue in Missoula, Montana.   The lease was for three years with a provision that Anderson could exercise a five-year option to extend the terms of the lease.   The record demonstrates that the parties contemplated a second five-year option, but there is no written agreement accordingly.   A written addendum, signed by the parties on or about June 15, 1990, specified that the written five-year option would begin on February 1, 1992.   The parties were in agreement that the premises would be used only for commercial purposes, and Anderson sublet the premises to various commercial tenants up through the time that Grenfell terminated the lease agreement.

¶10  A mutual covenant in the lease agreement provided that if Anderson was in default for failure to pay rent or otherwise perform under the agreement, and thereafter failed to remedy such default within ten days after written notice by Grenfell, then Grenfell could lawfully enter and repossess the premises as if the lease had not been made, effectively terminating the agreement.

¶11  From the commencement of the agreement, Anderson occupied only half of the premises, and in February 1989, sublet the other half

to Rick Bice (Bice), pursuant to an oral month-to-month tenancy. In February of 1991, Anderson relocated his business to a nearby building and sought to sublet his vacated half of the premises. On October 20, 1991, Anderson executed a five-year sublease agreement with Richard Houldson (Houldson), agreeing to sublet the entire premises. Anderson sent a letter to Bice, dated October 24, 1991, notifying Bice that Anderson had rented the entire building and that Bice had 30 days to vacate. Shortly thereafter, Bice informed Grenfell of the Anderson-Houldson sublease.

¶12 On October 17, 1991, however, Grenfell had sent to Anderson via certified mail a notice of default for failure to pay past due rent and utility bills, a letter that we determined in *Grenfell I* had neither provided Anderson with actual nor constructive notice. *See Grenfell I*, ¶¶ 35, 44-46. Eleven days later, on October 28, 1991, Grenfell entered and repossessed the premises by changing the locks. We determined that Grenfell's act of changing the locks effectively terminated the lease agreement between Grenfell and Anderson pursuant to the explicit provisions of the agreement. *See Grenfell I*, ¶ 50.

¶13 On November 25, 1991, Grenfell filed suit against Anderson, alleging breach of the lease agreement, unlawful detainer, and violation of the implied covenant of good faith and fair dealing. Anderson filed a counterclaim on February 21, 1992, alleging damages for forcible entry and forcible detainer, breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with Anderson's contractual relations.

4

¶14 Anderson prevailed on a motion for partial summary judgment wherein the District Court determined that the options contained in the lease agreement could be automatically exercised and could thus be a basis for an award of damages. Grenfell prevailed in the subsequent bench trial, receiving an award of $4,148.78, plus attorney fees and costs. The District Court dismissed all of Anderson's counterclaims, stating that Anderson had not presented credible evidence to support his claim for damages.

¶15 Anderson appealed and this Court affirmed in part, reversed in part, and remanded to the District Court for further proceedings. Upon remand, the District Court entered amended findings of fact, conclusions of law and an order, concluding that Anderson breached the lease agreement and the implied covenant of good faith and fair dealing for failing to timely pay rent and utilities to Grenfell, entitling Grenfell to $256.91. The District Court also concluded that Grenfell breached the lease agreement by failing to provide effective notice to Anderson of his default prior to entering and changing the locks on the premises. The District Court concluded that Grenfell's breach of the lease interfered with the Anderson-Houldson sublease, awarding Anderson $25,800.00 in "lost profits" resulting from Grenfell's breach of the lease agreement. The District Court denied Anderson's treble damage claim for forcible entry and forcible detainer and denied Anderson's punitive damage claim for tortious interference with contractual or business relations. The District Court concluded that Grenfell acted in good faith and did not breach the implied covenant of good faith

and fair dealing. The District Court finally concluded that neither party was the "prevailing party" for purposes of awarding attorney fees, and ordered that each party bear the burden of their own costs and fees.

## ISSUE 1

¶16 **Did the District Court exceed its jurisdiction on remand?**

¶17 Anderson argues that the District Court exceeded its jurisdiction on remand when it entered further findings and conclusions on Grenfell's original claims when Grenfell had not cross-appealed the District Court's initial order, and this Court's remand did not require further determination of Grenfell's claims. Anderson argues that the doctrine of *res judicata* barred the District Court from entering any further findings or conclusions on Grenfell's original claims. Grenfell responds that the District Court's amended findings and conclusions are directly in line with this Court's instructions on remand.

¶18 This Court has previously defined the interrelated theories of *res judicata* and "law of the case." In **Scott v. Scott (1997), 283 Mont. 169, 939 P.2d 998, we stated that "res judicata is a final judgment which, when rendered on the merits, is an absolute bar to a subsequent action between the same parties or those in privity with them, upon the same claim or demand."** *Scott*, 283 Mont. at 175, 939 P.2d at 1001 (citing *Fiscus v. Beartooth Electric Cooperative, Inc.* **(1979), 180 Mont. 434, 435-37, 591 P.2d 196**, 197). In contrast, "the law of the case doctrine 'expresses the practice of courts generally to refuse to reopen what has been decided. It expresses the rule that the final

6

judgment of the highest court is the final determination of the parties' rights.'" ***Scott***, 283 Mont. at 175, 939 P.2d at 1001-02; *Fiscus*, 180 Mont. at 436, 591 P.2d at 197.

¶19 "The general rule in Montana is that where a decision has been rendered by the Supreme Court on a particular issue between the same parties in the same case, whether that decision is right or wrong, such decision is binding on the parties and the courts and cannot be relitigated in a subsequent appeal." **Belgrade State Bank v. Swainson (1978), 176 Mont. 444, 446, 578 P.2d 1166, 1167 (citations omitted). Thus, "when a case is reversed and remanded, the trial court may not ignore the mandate and opinion of the reviewing court; instead, the trial court 'must proceed in conformity with the views expressed by the appellate court.'"** *In re Marriage of Pfeifer***, 1998 MT 228, ¶ 12, 291 Mont. 23, ¶ 12, 965 P.2d 895, ¶ 12 (citation omitted).**

¶20 Anderson contends that the District Court did not proceed on remand in conformity with the views expressed by this Court when it entered additional findings and conclusions on Grenfell's three original claims-breach of the lease agreement, breach of the implied covenant of good faith and fair dealing, and unlawful detainer.

¶21 Regarding Grenfell's claim for Anderson's breach of the lease agreement, the District Court originally found that Anderson breached the lease by not paying utilities for five months and missing the October rent payment. In calculating damages owed to Grenfell, the District Court included unpaid rent and utilities through January 1992, the end date of the lease agreement.

7

¶22 On appeal we determined Grenfell's default letters to Anderson provided neither actual nor constructive notice of Anderson's default. We did conclude, however, that Grenfell terminated the lease as a matter of law when he changed the locks and took possession of the premises on October 28, 1991. We thus held that Anderson could not be held liable for damages beyond this date and that the District Court erred in calculating damages through January 1992. *Grenfell I*, ¶¶ 35, 46, 50-55. We determined that, whether Anderson was in default was irrelevant, as Grenfell was entitled to recover all rent and utilities due up to the time that the lease was terminated. *Grenfell I*, ¶ 55. Consequently, we affirmed the District Court's calculation of damages owed by Anderson to Grenfell up to October 28, 1991, in the amount of $256.91. *Grenfell I*, ¶ 56.

¶23 On remand the District Court entered amended findings of fact consistent with this Court's determination that Anderson received no effective notice of default and that the termination of the lease was made effective by Grenfell's act of changing the locks. Consistent with these amended findings, the District Court entered amended conclusions of law, concluding that Grenfell was entitled to an award of $256.91. To the extent that this Court did not directly make a determination of whether Anderson's non-payment did or did not constitute a breach of the agreement, the District Court's additional determination that Anderson's non-payment of rent and utilities constituted a breach of the agreement is not inconsistent with the law of the case as determined in *Grenfell I*.

8

Whether the District Court's conclusion is correct is irrelevant in determining whether it exceeded its jurisdiction on remand. We conclude that it did not.

¶24 The District Court did not conduct further proceedings on Grenfell's claims or on Anderson's counterclaims. Rather, it amended its original findings and conclusions to bring them into conformity with this Court's views in *Grenfell I* that Grenfell was entitled to recover $256.91 in unpaid rent and utilities. In awarding this sum, the District Court did not exceed this Court's binding decision in *Grenfell I*, and is in conformity with the law of the case. *See* **Pfeifer**, ¶ **12;** *Scott*, 283 Mont. at 175, 939 P.2d at 1001; *Fiscus*, 180 Mont. at 436, 591 P.2d at 197.

¶25 Anderson further contends that the District Court exceeded its jurisdiction in entering additional conclusions of law regarding Grenfell's claim for breach of the implied covenant of good faith and fair dealing. The District Court originally entered no conclusions of law regarding Grenfell's good faith and fair dealing claim and this Court did not address this aspect of Grenfell's claim on appeal.

¶26 In its amended conclusions of law, the District Court concluded that Anderson's failure to pay rent and utilities pursuant to the provisions of the agreement was unreasonable conduct constituting a breach of the implied covenant of good faith and fair dealing, and therefore a breach of the contract. The District Court concluded, however, that damages stemming from this

breach are only the damages already awarded for breach of contract (i.e., the $256.91).

¶27 We again conclude that whether the District Court's conclusion on this issue is correct is irrelevant to the issue of whether it exceeded its jurisdiction on remand. To the extent that this Court made no determination in *Grenfell I* on Grenfell's claim for breach of the implied covenant of good faith and fair dealing, the District Court's determination is not barred by *res judicata* or by the law of the case. *See Pfeifer*, ¶ 12; *Scott*, 283 Mont. at 175, 939 P.2d at 1001; *Fiscus*, 180 Mont. at 436, 591 P.2d at 197. Anderson does not appeal the District Court's final determination of the merits of this claim, and we decline to address it further.

¶28 Finally, Anderson asserts that the District Court exceeded its jurisdiction when it entered additional conclusions of law regarding Grenfell's claim against Anderson for unlawful detainer. Again, in the original proceedings the District Court entered no specific conclusions of law regarding Grenfell's claim against Anderson for unlawful detainer. However, in *Grenfell I,* we declared void Grenfell's claim for unlawful detainer "under the logical conclusion that once locked out, Anderson could in no sense unlawfully detain the premises absent a showing of his reentry." *Grenfell I*, ¶ 53.

¶29 On remand, the District Court entered a single conclusion of law echoing this Court's opinion in *Grenfell I* nearly verbatim. Under no argument can we logically conclude that the District Court's amended conclusion is not in conformity with the views expressed by this Court on appeal or is inconsistent with the law

10

of the case. We therefore conclude that the District Court did not exceed its jurisdiction in its amended conclusions regarding Grenfell's claim for unlawful detainer, nor in addressing any of Grenfell's other claims in his original complaint.

**ISSUE II**

¶30 **Did the District Court mistakenly base Anderson's counterclaim for breach of the lease agreement on an issue not pled or raised at trial?**

¶31 In its amended findings of fact and conclusions of law, the District Court references a letter sent by Anderson to Grenfell for the purpose of notifying Grenfell that he was in default of the lease agreement for failing to provide air conditioning on the leased premises. Upon review of the lease language, the District Court determined that no reference to air conditioning existed in the lease agreement and that Grenfell was not in default of the lease for not providing air conditioning services.

¶32 Anderson notes that the issue of the air conditioning was remarked in his October 29, 1991, letter to Grenfell, but that Anderson did not raise in his answer and counterclaim anything having to do with the air conditioning, nor did he subsequently request relief on such grounds.

¶33 In response, Grenfell, as well as this Court, agrees that Anderson did not counterclaim for breach of the lease agreement based upon any action or inaction taken by Grenfell in regard to the air conditioning. To the extent that the District Court based its determination of Anderson's claim for breach of the lease agreement on Anderson's October 29, 1991, letter, we conclude that

11

the District Court erred. However, any error in this regard is immaterial in light of the District Court's subsequent determination of Anderson's breach claim on the merits.

¶34 Anderson's original counterclaim for Grenfell's breach of the lease agreement is based upon Grenfell's improper October 17, 1991, notice of default and subsequent lockout on October 28, 1991. In addressing the merits of this counterclaim on remand, the District Court, consistent with this Court's decision in *Grenfell I*, concluded that Anderson did not receive either actual or constructive notice from Grenfell that Anderson was in default on the lease agreement. *Grenfell I*, ¶¶ 35, 46. The District Court subsequently concluded that Grenfell breached the lease agreement in failing to provide proper notice prior to locking Anderson out of the premises.

¶35 In its analysis of Anderson's breach claim, the District Court concluded that Anderson presented "clearly ascertainable" evidence of "lost profits" which were proximately caused by Grenfell's breach of the agreement. The District Court found that Anderson entered into a valid sublease agreement with Richard Houldson on October 20, 1999, and that Grenfell was aware of the Anderson-Houldson sublease, the term of which was for four years and two months, from December 1, 1991 to January 31, 1996.

¶36 The District Court concluded that Anderson was entitled to $516.00 per month in lost profits for a total of 50 months, totaling $25,800 in "lost profits" for Grenfell's breach of the lease agreement. Anderson does not appeal this finding, and

12

neither does Grenfell suggest that the District Court erred in its conclusion or request this Court to reverse the award to Anderson for Grenfell's breach.

¶37 Thus, although we have concluded that the District Court mistakenly based part of Anderson's claim for breach of the lease agreement on the issue of air conditioning, we conclude that the District Court nonetheless adjudicated Anderson's counterclaim for breach of the lease agreement upon the merits. The District Court's adjudication is affirmed accordingly.

## ISSUE III

¶38 **Did the District Court err in concluding that Anderson was not the prevailing party and therefore not entitled to attorney fees?**

¶39 Both parties claimed to be prevailing parties entitling each to an award of attorney fees pursuant to the terms of the lease agreement. The lease agreement provides:

> In the event of litigation arising out of this lease, including any litigation for the collection of rent, the prevailing parties shall be allowed a reasonable attorney's fee together with costs of suit and other collection costs expended.

The District Court cites to *Kennedy v. Dawson*, 1999 MT 265, 296 Mont. 430, 989 P.2d 390, for the rule that there is no prevailing party where both parties gain victory but also suffer a loss. It further cites to *Rustics of Lindbergh Lake, Inc. v. Lease* (1984), 213 Mont. 246, 690 P.2d 440, for the rule that, while no one factor should be considered in determining the prevailing party, the party that survives an action involving a counterclaim with the net judgment should generally be considered the prevailing party. The District Court acknowledged that Anderson was the net prevailing

13

party in that he prevailed on his counterclaim for breach of contract and was awarded $25,800.00 in lost profits. But the District Court additionally ruled that Anderson was the initial breaching party and denied attorney fees to either party, citing *Empire Dev. Co. v. Johnson* (1989), 236 Mont. 433, 770 P.2d 525, for the rule that a district court retains discretion to award no attorney fees where both parties breach the same contract.

¶40 Anderson asserts that the District Court erred, arguing that he neither breached the lease agreement nor suffered a loss, and, therefore, as the net prevailing party, is entitled to attorney fees under the express terms of the agreement. Arguing that he suffered no loss, Anderson points to *Kennedy v. Dawson* for the rule that payment of a preexisting obligation cannot be considered a loss, and argues that the $256.91 awarded to Grenfell is an amount that Anderson owed as a prior obligation, and is thus improperly characterized as a loss. *See Kennedy*, ¶ 53. Of significance, Anderson notes and the record reflects that Anderson did not dispute owing the rent and utilities at issue, but merely disputed receiving proper invoicing of the amount due and further disputed receiving proper default notices once he was past due.

¶41 In *Kennedy*, the plaintiff instituted an action requesting that the court determine ownership of land. *Kennedy*, ¶¶ 25-26, 53. Kennedy prevailed on summary judgment and, as the prevailing party, was obligated under the profit sweep provision of the land purchase agreement to pay the defendant, Dawson, $100,000 in order to successfully satisfy the terms of the agreement. *Kennedy*, ¶ 49.

14

This Court held that the requirement of Kennedy to pay the $100,000 could not be considered a loss to Kennedy, as it was an obligation that Kennedy assumed under the contract as the prevailing party. *Kennedy*, ¶ 53.

¶42 From this holding, Anderson argues that he, too, already owed the $256.91 that Grenfell sued to recover, and, notwithstanding that Grenfell prevailed on this claim, that it cannot be considered a loss to Anderson as he did not dispute already owing the judgment of $256.91.

¶43 *Kennedy* and the present situation, however, are factually distinguishable. Kennedy petitioned the district court to determine himself as the proper conveyee of the property, thus obligating him to fulfill the terms of the agreement as the purchaser. *See Kennedy*, ¶¶ 25-26, 53. In effect, Kennedy requested, as the purchaser, that he be given the opportunity to fulfill all terms and obligations of the agreement, including a payment of $100,000 to Dawson under the profit sweep provision.

¶44 Conversely, Grenfell sued Anderson to recover a preexisting obligation owed by <u>Anderson</u>, and needed to assume no preexisting obligation on his own part as a prevailing party. This case presents the traditional situation where parties agree that attorney fees are appropriate for the prevailing party, and serves the provision's purpose and intent: that of protecting the prevailing party from the cost of litigation in order to receive the full benefit of what the opposing party is *already obligated to*

*pay.*  Thus, we find little merit in Anderson's reliance on *Kennedy*, as that case is easily distinguishable.

¶45  However, we do find merit in Anderson's argument that he did not dispute owing rent to Grenfell for the relevant months, but merely disputed receiving proper notice of the amount due and proper notice of default–thus, not disputing being in default, but disputing being in breach of the lease agreement.  We first note that what acts constitute "default" is not specifically defined in the lease agreement.  However, it is clear from the plain language of the agreement that non-payment of rent by the lessee on or before the first day of each month for which the payment of rent is due, will constitute a default on the agreement.  Based upon the terms of the agreement, the lessee will subsequently be in breach of the agreement if, within ten days of receiving written notice of default, lessee fails to remedy such default.

¶46  It is the law of the case from *Grenfell I* that Anderson did not receive either actual or constructive notice from Grenfell that he was in default on the agreement, and therefore, that the ten-day period for Anderson to cure the default did not commence.  *See Grenfell I*, ¶¶ 35, 44-46.  The District Court thus erred in concluding that Anderson was the initial breaching party by merely being in default on the agreement.  Pursuant to the lease agreement's explicit terms, Anderson could not be in breach of the agreement unless failing to remedy his default prior to the running of the ten-day cure period, a period that only begins running subsequent to receipt of proper written notice.

16

¶47 As we conclude, and the record demonstrates, that Anderson did not dispute owing past-due rent to Grenfell, but merely disputed that Grenfell sent invoices with amounts due, we cannot characterize Grenfell's judgment of $256.91 as a loss to Anderson, nor can we properly characterize Grenfell as a prevailing party. It is undisputed that Anderson did not receive proper notice of his default and that the ten-day grace period had not run. Anderson's default on rent and/or utility payments for the months that were not properly invoiced cannot, therefore, be characterized as a breach of the lease agreement.

¶48 The District Court correctly noted that it retains discretion to award attorney fees where a contract provision grants attorney fees to the prevailing party, but where both parties have breached the express terms of the agreement. *See Empire Dev. Co. v. Johnson* (1989), 236 Mont. 433, 441, 770 P.2d 525, 530. However, because Anderson was not a breaching party and because he did not suffer a loss as a result of this litigation, the District Court did not have discretion to deny attorney fees to the prevailing party contrary to the express provision of the agreement. *See Transaction Network, Inc. v. Wellington Technologies, Inc.*, 2000 MT 223, ¶ 19, 301 Mont. 212, ¶ 19, 7 P.3d 409, ¶ 19 ("[i]f an agreement between parties provides for attorney's fees, a district court is bound by its terms")(citation omitted).

¶49 We conclude that Anderson, as the only prevailing party in this action, is entitled to reasonable attorney fees pursuant to

17

the express terms of the lease agreement.  We reverse and remand accordingly.

## ISSUE IV

¶50  **Did the District Court err in denying Anderson's counterclaims for forcible entry and forcible detainer?**

¶51  The District Court denied Anderson's counterclaim for forcible entry and counterclaim for forcible detainer.  Pursuant to § 70-27-102, MCA, a person is guilty of forcible entry:

> (1)  by breaking open doors, windows, or other parts of a house or by any kind of violence or circumstance of terror enters upon or into any real property or mining claim; or

> (2)   after entering peaceably upon real property or mining claim, turns out by force, threats, or menacing conduct the party in possession.

¶52  The District Court found that when Grenfell entered the premises on October 28, 1991, he did so peaceably, without breaking windows or breaking open doors or other parts of the property, and therefore did not commit forcible entry.  The District Court also found that Anderson was not present when Grenfell took repossession of the premises and did not know that he was locked out until sometime in November 1991.

¶53  Anderson argues that the use of locks by Grenfell to prevent Anderson from peaceable possession was itself the exercise of force sufficient to satisfy the requirements of forcible entry.  Anderson argues that this Court's decision in *Sage v. Rogers* (1993), 257 Mont. 229, 848 P.2d 1034, supports his argument that the use of a padlock is sufficient to establish forcible entry and forcible detainer.  We disagree.

18

¶54   In *Sage*, the landlord in a commercial lease agreement served the tenant with a notice of eviction and used a padlock to deny the defendant entrance subsequent to the landlord's good faith belief that the lease had been properly terminated.  *Sage*, 257 Mont. at 233, 241, 848 P.2d at 1037, 1042.  We affirmed the District Court's denial of nominal damages on the defendant's claim for forcible entry or forcible detainer, where the District Court found that the landlord acted in a good faith belief that the tenant could properly be locked out.  *Sage*, 257 Mont. at 241, 848 P.2d at 1041-42.  However, neither this Court nor the District Court made a determination as to whether the padlocking of the front door did or did not constitute either a forcible entry and/or a forcible detainer on the part of the landlord.

¶55     The word "force" is generally interpreted as including not only actual application of physical force, but such threats or display of physical force as are reasonably calculated to inspire fear of death or bodily harm.  *Lambert v. Helena Adjustment Co.* (1924), 69 Mont. 510, 513, 222 P. 1057, 1058.  This Court has interpreted force as "unlawful violence."  *Lambert*, 69 Mont. at 513-14, 222 P. at 1058.  The objective of § 70-27-102, MCA, is to furnish a summary remedy to obtain possession of real property and to prevent even rightful owners from taking the law into their own hands and proceeding by violence to take possession.  *Herzog v. Texas Co.* (1931), 88 Mont. 580, 587-88, 294 P. 962, 963 (citations omitted).  Whether the circumstances surrounding a defendant's entry either constitute or do not constitute violence, and

19

therefore forcible entry, is a question for the fact finder. *See Herzog*, 88 Mont. at 588, 294 P. at 964-65 ("[i]t is for the jury to determine whether there was a forcible entry"). This Court will not overturn a District Court's finding unless it is clearly erroneous. *Tungsten Holdings, Inc. v. Olson*, 2002 MT 158, ¶ 13, 310 Mont. 374, ¶ 13, 50 P.3d 1086, ¶ 13.

¶56 We conclude that the District Court's finding that Grenfell's actions of changing the locks on the premises did not constitute forcible entry, as he broke nothing and entered peaceably, is based upon undisputed, credible evidence and is, therefore, not clearly erroneous.

¶57 Anderson next asserts that the District Court erred in denying his claim for forcible detainer. Section § 70-27-103, MCA, provides:

> Every person is guilty of a forcible detainer who either:
>
> (1) by force or by menaces and threats of violence unlawfully holds and keeps the possession of any real property or mining claim, whether the same was acquired peaceably or otherwise; or
>
> (2) in the nighttime or during the absence of the occupant of any lands or mining claim unlawfully enters upon real property and, after demand made for the surrender thereof, for the period of 5 days refuses to surrender the same to such former occupant. The occupant of real property or mining claim, within the meaning of this subsection, is one who, within 5 days preceding such unlawful entry, was in the peaceable and undisputed possession of such lands.

¶58 The District Court found that Grenfell did not use force, threats, or violence to keep possession of the premises subsequent to entering and changing the locks on October 28, 1991. The District Court further found that Anderson's demand letter of

20

November 1991, demanding that Grenfell surrender the leased premises to Anderson, was based upon Anderson's cure of the defaults that were highlighted in Grenfell's October 30, 1991, notice of default. The District Court concluded that Anderson's cure of defaults alleged in the October 30, 1991, letter, are irrelevant as a matter of law because Grenfell's changing of the locks on October 28, 1991, effectively terminated the lease between Grenfell and Anderson. *See Grenfell I*, ¶ 50.

¶59 Anderson argues that the District Court erroneously relied upon subsection (1) of § 70-27-103, MCA, and overlooked the exclusive requirements of subsection (2), which merely requires the defendant to unlawfully enter the premises in the absence of the occupant and refuse to surrender the premises within five days of such demand from the occupant.

¶60 We agree with the District Court that Anderson's November 1991 demand letter was ineffective pursuant to § 70-27-103, MCA, as Grenfell had terminated the lease agreement by entering and repossessing the premises on October 28, 1991. We determined in *Grenfell I* that, upon Grenfell's terminating the lease agreement by the act of changing the locks and repossessing the premises, Anderson's obligations under the agreement ended as a matter of law. *See Grenfell I*, ¶ 51. We likewise conclude that Anderson could no longer, subsequent to the termination of the lease, claim a legal right to reenter and repossess the premises under the terminated agreement wherein Anderson himself owed no further obligations.

21

¶61 As we conclude that Grenfell had terminated the lease prior to Anderson's letter of November 1991, we also conclude that the District Court did not err in denying Anderson's claim for forcible detainer or in denying Anderson's request for treble damages.

**ISSUE V**

¶62 **Did the District Court err in denying Anderson's counterclaim for tortious interference?**

¶63 The District Court determined that Anderson did not establish a prima facie case that Grenfell tortiously interfered with Anderson's sublease. The District Court first noted that Anderson's claim for tortious interference in Count VI of his counterclaim stemmed solely from Grenfell's alleged interference in the contractual relationship between Anderson and Bice, wherein Grenfell sent to Bice a letter dated October 29, 1991, informing Bice that Anderson was in default on the lease and that Bice should thereafter remit payment on the sublease to himself rather than Anderson. The District Court further noted that Anderson, in his proposed findings and conclusions after remand, also alleged that Grenfell tortiously interfered with the contractual relations between he and Houldson.

¶64 In order to establish a prima facie case of interference with contractual or business relations, it must be shown that the defendant's acts (1) were intentional and willful, (2) were calculated to cause damage to the plaintiff in his or her business, (3) were done with the unlawful purpose of causing damage or loss, without right or justifiable cause on the part of the actor, and

22

(4) that actual damages and loss resulted. *Bolz v. Myers* (1982), 200 Mont. 286, 295, 651 P.2d 606, 611 (citation omitted).

¶65 The District Court found that Grenfell's lockout on October 28 and the letter of October 29, 1991, were based upon a good faith belief that Anderson was in default on the lease agreement for failing to pay rent and utilities, and that Anderson was in breach of the agreement for failing to remedy his default within the ten-day cure period, which ended on October 27, 1991. This finding was predicated upon the District Court's conclusion that Grenfell held a good faith belief that his default notice of October 17, although unclaimed by Anderson, constituted effective notice of default.

¶66 Noting that Anderson terminated the sublease with Bice by written letter of October 24, 1991, the District Court concluded that any interference by Grenfell with the Anderson-Bice sublease occurred subsequent to Anderson's termination of the subtenancy, and further, that any alleged "willful interference" by Grenfell was based upon a good faith belief that his notice was sufficient and that his actions were justified.

¶67 Likewise, the District Court similarly concluded that any interference by Grenfell with the Anderson-Houldson sublease was also based upon a good faith belief that his notice of default was sufficient, and that Grenfell's actions did not constitute intentionally unlawful and willful interference with the Anderson-Houldson sublease for the purpose of causing damages to Anderson. Thus, the District Court ultimately concluded that Anderson did not

23

establish a prima facie case of tortious interference with contractual or business relations by Grenfell.

¶68 Anderson asserts that the District Court's conclusion is contrary to the law of the case as determined in *Grenfell I*, and that based upon the doctrine of *res judicata*, the District Court erred by effectively reversing this Court's decision in *Grenfell I*. Anderson points to the language in *Grenfell I* wherein we stated: "We hold that Anderson has presented sufficient credible evidence to support his claim for damages . . . ." *Grenfell I*, ¶ 58. Anderson argues that the sufficient, credible, and overwhelming evidence presented at trial supports his counterclaim for tortious interference, and that the District Court's conclusion to the contrary is error based upon the above language of this Court.

¶69 In the original action, the District Court concluded that Anderson was the initial and sole breaching party, received actual and constructive notice of default, did not present credible evidence to support his claim for damages against Grenfell, and it thus did not reach the merits of Anderson's claim for damages. On appeal, this Court in *Grenfell I* reversed a number of the District Court's conclusions of law, including its conclusions that Anderson received actual or constructive notice of default prior to Grenfell's lockout, and remanded to the District Court for further consideration of Anderson's claims in light of our holding. *See Grenfell I*, ¶¶ 35, 44-46, 58-59. Reviewing evidence presented by Anderson, we stated: "We conclude that Anderson, contrary to the District Court's conclusion, has presented credible evidence to

24

support his claim for lost profits. Whether Grenfell is in fact liable for damages under any of Anderson's claims, as well as whether he could have foreseen Anderson's lost profits at the time their lease was made, are matters that should be addressed upon remand." *Grenfell I*, ¶ 64.

¶70 Decidedly, this Court did not make any ruling on the merits of Anderson's counterclaims against Grenfell, but merely reversed the conclusion of the District Court that Anderson presented no credible evidence to support his alleged claims. We remanded precisely for a determination on the merits whether Grenfell was, in fact, liable under any of Anderson's claims. Thus, we do not find Anderson's argument compelling that the District Court was bound by the doctrine of *res judicata* to find that Anderson had prevailed on the merits of his counterclaim alleging that Grenfell was guilty of tortious interference with Anderson's contractual or business relationships with either Bice or Houldson.

¶71 The fulcrum of the District Court's denial of Anderson's claim for tortious interference is the following: (1) The claim, as written, was based on the sublease between Anderson and Rick Bice; (2) Anderson terminated the sublease with Bice in a written letter of October 24, 1991; (3) Grenfell's alleged "willful interference" with this sublease agreement came *after* Anderson's letter terminating the Anderson-Bice subtenancy; and finally (4), Grenfell's act of changing the locks on October 28, 1991, was done on the good faith belief that he had given proper notice of default and that Anderson was in breach of the lease agreement. The

25

District Court thus concluded that Grenfell could not have tortiously interfered with the Anderson-Bice sublease, as the sublease was terminated prior to Grenfell's lockout, nor did any "willful interference" occur with the Anderson-Houldson sublease, as Grenfell believed, in good faith, that his lockout of Anderson was done "with right and justification" on his part.

¶72 Anderson cites extensively to portions of the trial transcript and much of his own testimony as evidence that Grenfell attempted to interfere with the Anderson-Bice sublease on various occasions prior to October 24, 1991, citing to a dispute regarding Grenfell's alleged refusal to fix the air conditioning and to a dispute regarding Grenfell's claim of entitlement to reimbursement from Bice for work performed on the premises.

¶73 In considering this evidence, the District Court found that Grenfell admitted to conferring with Bice "around the time of default" regarding Bice taking over the entire premises and thereafter remitting the rent to Grenfell instead of Anderson. The District Court found, however, that Grenfell and Bice did not enter into a lease agreement until after Grenfell terminated the agreement with Anderson, and that Grenfell could not have thus willfully interfered.

¶74 This Court will not set aside a district court's findings of fact unless they are clearly erroneous, and we give due regard to the opportunity of the district court to judge the credibility of witnesses.  Rule 52(a), M.R.Civ.P.; *Tungsten Holdings, Inc. v. Olson*, 2002 MT 158, ¶ 13, 310 Mont. 374, ¶ 13, 50 P.3d 1086, ¶ 13;

26

*Grenfell I*, ¶ 24. A district court's findings are clearly erroneous if they are not supported by substantial credible evidence, if the trial court has misapprehended the effect of the evidence, or if a review of the record leaves this Court with a definite and firm conviction that a mistake has been committed. *Tungsten*, ¶ 13; *Grenfell I*, ¶ 24 (citation omitted). Additionally, in determining whether a district court's findings are supported by substantial evidence, this Court must view the evidence in the light most favorable to the prevailing party. *Grenfell I*, ¶ 24 (citation omitted).

¶75 Upon review of the record and viewing the evidence in a light most favorable to Grenfell on Anderson's counterclaim of tortious interference with business or contractual relations, we conclude that the District Court did not err in finding that Anderson terminated the Anderson-Bice sublease prior to any alleged tortious interference by Grenfell, nor did it err in finding that Grenfell terminated the lease agreement based upon a good faith belief that Anderson was in breach of the agreement. The District Court, therefore, did not err when it concluded that Anderson did not establish a prima facie case of tortious interference of business or contractual relations on either sublease.

¶76 The District Court's decision is affirmed accordingly.

## ISSUE VI

¶77 **Did the District Court err in denying Anderson's counterclaim for punitive damages?**

¶78 Anderson's counterclaim for punitive damages is based upon allegations that Grenfell had knowledge of the Anderson-Houldson

27

sublease and, with intentional disregard of the high probability of injury to Anderson, acted with indifference in refusing to surrender the premises subsequent to Anderson's demand letter of October 29, 1991. Anderson alleged that such refusal was caused and induced by the unlawful and malicious acts by Grenfell and resulted in Houldson refusing to perform payment under the sublease.

¶79 Section 27-1-220, MCA, provides:

> **Punitive damages - when allowed.** (2)(a) Unless otherwise expressly provided by statute, punitive damages may not be recovered in any action arising from:
> (i) contract; or
> (ii) breach of contract.

¶80 This case is a contract case and no applicable statute provides for punitive damages. We have previously held, however, that tort type damages may be available for traditional contract related torts such as fraud, fraudulent inducement, and tortious interference with a contract. *See, generally, Story v. City of Bozeman* (1990), 242 Mont. 436, 791 P.2d 767. We have also concluded that a person could be liable for breach of a contract to which they are a party and also be liable for the tort of intentional interference. We have noted that there can be a distinction between mere breach of a contract and actions which, by their outrageous nature, tortiously interfere with the business relations between the plaintiff and his or her customer. *See Bolz v. Meyers* (1982), 200 Mont. 286, 651 P.2d 606; *see also Daniels v. Dean* (1992), 253 Mont. 465, 473-74, 833 P.2d 1078, 1084; *Moore v. Handy* (1988), 230 Mont. 158, 748 P.2d 477 (affirming an award of

28

punitive damages against a defendant for breach of a duty to assign a lease, separate and distinct from the breach of the lease itself) (overruled on other grounds).

¶81 However, in light of this Court's affirmation that the District Court did not err in concluding that Anderson failed to establish a prima facie case of tortious interference of business or contractual relations on either of the subleases, we likewise affirm its denial of punitive damages to Anderson.

¶82 Affirmed in part, reversed in part, and remanded.


/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ TERRY N. TRIEWEILER
/S/ JIM REGNIER